**Affirmed and Majority Memorandum Opinion filed February 13, 2020**



**In The**

# Fourteenth Court of Appeals

## NO. 14-19-00666-CV &
## NO. 14-19-00724-CV

## IN THE INTEREST OF E.W., R.L., W.W., E.W., CHILDREN

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2018-04172J**

### MAJORITY MEMORANDUM  OPINION

Appellants E.L.W. ("Father") and A.F. ("Mother") separately appeal the trial court's final order terminating their respective parental rights and appointing the Texas Department of Family and Protective Services ("Department") as sole managing conservator of their children E.W. ("Eshan"), W.W. ("Wystan"), and E.W. ("Estrid").[1]  Mother also challenges the judgment terminating her parental rights to, and appointing the Department as sole managing conservator of, R.L.

---

[1] We use pseudonyms to refer to appellants and the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

("Reba"), who has a different father, L.L. ("Linus"). Linus does not challenge the judgment terminating his parental rights to Reba.

On appeal, Mother challenges the legal and factual sufficiency of the evidence to support each of the four grounds for termination and the trial court's adverse best-interest-of-the-child finding as to each of the four children. Father raises legal and factual sufficiency complaints only to the two endangerment grounds for termination, and asserts for the first time on appeal a due process challenge. We affirm.

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Pretrial Removal Affidavit

In June 2018, the Department received a referral from law enforcement alleging Mother and Father had been arguing, that Father threw things out of the apartment they shared, and that Father "grabbed [Mother] and slammed [her] to the ground" ("Referral 1"). The couple's four children were present in the residence at the time. After Father left the apartment, Mother spoke with law enforcement but refused to press charges or cooperate in the police investigation. According to the referral, the home was a mess and smelled like "old marijuana" smoke.

The day after this incident, the Department's investigator, Candice Mouton, met with the entire family at their apartment. She created a report that later would be admitted into evidence at trial. According to the report, Mother, Father, and the two older children, Reba and Eshan, denied any domestic violence between Mother and Father. Mother, however, acknowledged an earlier domestic-violence incident. During the family interview, another non-family household member (Morrison) came home. In response to Mouton's questioning, Morrison denied being present on the date of the incident and denied witnessing any domestic violence between

2

Mother and Father.

Both Mother and Father denied current drug use and submitted urine for analysis. Testing showed negative for Mother. Father's results were positive for cocaine. Morrison, who also submitted a sample for analysis, tested negative.

The Department continued to stay in contact (either in face-to-face meetings and interviews or by telephone) with Mother and Father and the children through the remainder of June and July 2018. After giving Mother the urine analysis results, Mouton explained the Department's requirements and scheduled the required follow-up meeting with the children. Mother agreed they would meet with Mouton and told Mouton she had moved to a new apartment in the same complex where she was staying with a different, unrelated individual.

After the next meeting, Mouton proposed a safety plan to which both Mother and Father agreed. Father admitted that he had used cocaine just three days earlier. Father agreed to complete substance-abuse classes and to follow all recommendations he was given. Father also agreed not to have any unsupervised contact with the children. Mother said she would serve as a monitor to ensure the children's safety and well-being and would report any concerns about drug usage and non-compliance to the Department.

Mother later reported to Mouton that Father would not leave home, and Mouton told Mother she would work to find Mother and the children other living options. Mother informed Mouton that she "did not want her family split up," but on August 9, 2018, Mother told Mouton that she was willing to leave with the children because Father was unwilling to leave the household. Mouton worked actively to help Mother get alternate living arrangements and ultimately assisted her in obtaining placement for Mother and the children at the Star of Hope.

3

Ten days after Mother and the children moved into the Star of Hope, the Department received a referral for medical neglect and abuse of Wystan by Mother ("Referral 2"). The report stated that Wystan sustained a spiral fracture of his right tibia and a bowing fracture of his right fibula on August 17, 2018, and Mother delayed in seeking medical treatment until August 20, 2018. In the physician's statement attached to the affidavit, Wystan's physician noted that "patient's delay in care [was] concerning for medical neglect."

Mouton arrived at the hospital and served Mother with notice of removal of her children. Wystan was taken to Texas Children's Hospital and Eshan, Reba, and Estrid were transported to the Youth Services Center. The Department was unable to serve Father with notice of the removal because he was in jail for a pending assault on a family member. The Department had no contact information for Linus, so he was not served either. Mother did not provide any names of other possible family members who could take the children. On August 21, 2018, the district court signed an emergency order appointing the Department as the children's Temporary Managing Conservator for 14 days. The district court appointed the Department the children's Temporary Managing Conservator on September 4, 2018, at the conclusion of the adversary hearing.

## B. The Trial

A bench trial commenced on July 25, 2019. At the start of trial, the Department offered into evidence and the trial court admitted a number of items, including the pretrial removal affidavit, an indictment against Father for Injury to a Child containing a probable-cause affidavit, other criminal judgments, and Wystan's medical records. Several witnesses also testified.

*The Department's Caseworkers*

Mouton testified that the Department's initial contact with the family came

4

as a result of Referral 1 (the altercation between Mother and Father that ended when Father "slammed" Mother to the ground in front of the children). Mouton said when she arrived at the apartment to begin her investigation, she had concerns that one or both parents were abusing drugs. Test results were negative for Mother and positive for Father, for cocaine. Mouton testified that both Mother and Father denied there had been an altercation between them that day, but both acknowledged that Father had assaulted Mother in 2017.

Mouton said the Department immediately put a safety plan into place to ensure there was no unsupervised contact between Father and the children. Additionally, Father was told to take substance-abuse classes so he could remain in the home with the family. But, while the Department was trying to schedule the classes for Father, Mother contacted Mouton and reported that Father was refusing to leave the home. Mother and Mouton discussed other possible living arrangements for Mother and the children, and Mother reiterated that she had no family, so there was nowhere for them to go, and they began talking about possible shelters. Mother confided to Mouton she earlier had lived at the Star of Hope and that is where Mother and the children found shelter beginning on August 10, 2018. Mother and the children were there only about a week when the Department received Referral 2.

Mouton testified the Department sought emergency custody of the children because Mother's explanation of how Wystan had sustained his injuries was inconsistent with the injuries. The Department believed Wystan had been a victim of child abuse and had been denied immediate medical treatment when Mother refused to allow Emergency Medical Services ("EMS") to transport the child to the hospital. Mouton confirmed that none of the children stated Mother had injured them or made any outcry about physical abuse during her investigation. Yet,

5

Mouton testified the incident involving Wystan was not the first one in that family the Department had investigated.

Mouton's pretrial removal affidavit detailed various incidents. Mother had tested positive for marijuana at Reba's birth in 2009, and at that time the Department had received a referral for physical abuse of Reba. Mother successfully completed services, and the Department closed the case when Mother acted on a referral to the HOPE Center. In 2016, the Department received another referral on Mother, this time for neglectful supervision when Mother attempted suicide. At that time, Eshan was eight years old, Reba was six years old, and Mother was pregnant with Wystan. The investigation showed no signs of abuse or neglect of either child. In 2017, the Department received a referral for sexual abuse of Reba, who was nine years old at the time, but the Department closed the case "when there was no disclosure."

Derrick Callicut, the Department caseworker, testified about the parents' progress under the court-ordered service plan put in place after the court placed the children into the Department's care. According to Callicut, neither Mother nor Father successfully completed their respective service plans. Mother had not provided the Department with proof of stable housing or income, had not attended all of the required counseling sessions, and had not updated the Department with new contact information. Father had not completed individual counseling or drug-abuse treatment, including the Batterer's Intervention Prevention Program. Nor had Father participated in random drug tests, or provided the Department with proof of stable housing or income. Callicut conceded that Mother provided him a lease on the day of trial, but explained its shortcomings, noting that the lease was for a future date, and that it only accounted for Mother as an occupant, (not the children).

6

Callicut testified about the parents' scheduled visitation with the children, stating he met Mother and Father at various locations throughout the city at the beginning of the case instead of at their home. Mother and Father visited the children on a supervised basis one or two times a month until January 2019. According to Callicut, these visits were "appropriate." Callicut offered as possible explanations of why neither Mother nor Father had visited the children since January 2019, that there was a warrant out for Mother's and Father's arrest, they continued to test positive for drugs, and allegedly there had been "violent activity between the foster worker and [Mother and Father]."

Callicut briefly described the requests for, refusals of, and results of the random drug testing ordered for Mother and for Father as part of their service plans. He testified both parents tested positive for dangerous narcotics during the pendency of the case, but neither parent submitted to ordered drug tests after January 2019, in Mother's case, or after September 2018, in Father's case.

Callicut also testified that the Department had concerns about domestic violence between Mother and Father, noting that Referral 1 remained an active case. When asked about Mother's and Father's criminal records, Callicut testified he did not want to speculate about the details of Father's record, but knew it was "pretty extensive." Callicut was aware of only the January injury-to-a-child-by-omission charge against Mother.

Callicut confirmed Mother's testimony that the children had reached out to Mother and Father via social media, actions expressly prohibited by the district court's visitation order. Callicut explained the reason for the order was not to prevent Mother and Father from talking with the children, but rather that the communications be proper and in accordance with the visitation order. Callicut also confirmed Mother's testimony about Mother's sending cards and letters and

7

bringing supplies, food, clothes, and birthday cakes to the children when she visited, but those visits and provisions ended in January 2019. Callicut testified that Father, too, had provided books and clothing and sent letters and cards to let the children know he cared about them.

Callicut testified that he never contacted any of the EMS workers who came to appellant's apartment, and that he has not seen any medical records regarding whether Wystan should have been transported to the hospital by paramedics on the day of the child's injury.

*Father*

Father testified at trial, both acknowledging and denying a history of engaging in family violence. In cross examination, after agreeing that he was charged with assaulting Mother, Father answered "Yes" to the immediate follow-up, "And your children were present during the time the assault occurred, correct?" Yet, when questioned by his own lawyer, he denied assaulting Mother. Father admitted being present when Wystan suffered injuries and said he told EMS Wystan's leg was not broken "because when you hit your shin, it swell up." Father asserted that he stopped visiting his children because the Department said he was not allowed to do so. Father confirmed he had not completed his service plan, and he denied using drugs. Father stated his belief that there was no reason to submit to a hair-follicle test as long as he submitted urine for testing. Father stated the apartment he and Mother shared had room for the children, although he acknowledged the apartment had only two rooms. Finally, Father acknowledged he had not provided the Department with proof of stable income because "I don't get checks. I don't work."

*Mother*

In answering questions about Wystan's injuries, Mother testified that she

called paramedics "as soon as she heard it" and her son "started crying," and that paramedics came to her apartment. She testified that the paramedics told her that her son's leg was not broken, and that he only needed an ice pack. Mother testified that once she realized that her son was not getting better, she took the bus and took him to the hospital herself. Mother testified that the injury occurred on Friday, she took Wystan to the hospital on "Monday." Medical records introduced at trial, however, indicate that the parents "[a]ttempted to seek care however [the] wait was too long."

*Probable-Cause Affidavit and Medical Records*

Following Wystan's injury, Father was indicted for injury to a child. The affidavit attached to the indictment indicates that Houston Northwest Medical Center made an "injury to a child" report. When the responding officer (Neeley) arrived at the hospital, he spoke with Deputy F. Lopez, who informed him Mother had arrived at the hospital with Wystan. Medical professionals were evaluating the child for a spiral fracture and a bow fracture of his right leg. According to Deputy Lopez, Mother told him she was Wystan's mother and that Wystan's injury had occurred three days earlier. Mother told Deputy Lopez she had called EMS shortly after Wystan got hurt, but claimed EMS said there was no need to transport Wystan to the hospital. At trial, Mother said EMS told her all she needed to do for Wystan was put ice on his leg, but when the child did not improve over the weekend, she brought him to the hospital.

Emergency Room ("ER") clinical staff told Officer Neeley that Wystan's injuries were consistent with child abuse and "could have led to permanent disfigurement." ER clinical staff said Wystan needed to be transported to Texas Children's Hospital for surgery. Given the discrepancy between Mother's statements and those from the ER staff, Officer Neeley reviewed the EMS records.

9

Neeley's affidavit indicates that, according to the EMS records, Wystan was crying when EMS arrived at the apartment on August 17, 2018, and that EMS personnel told Mother Wystan needed to go to Texas Children's Hospital for treatment. Neeley further reported that initially Mother gave EMS permission to transport Wystan, but after he was loaded into the ambulance, Mother withdrew her permission and removed Wystan from the ambulance. Neeley's affidavit states, "EMS records documented that [Mother] told EMS [Wystan] couldn't be transported because an UBER from the hospital would cost too much." According to the records, Mother told EMS she would take Wystan to a local urgent care facility instead.

*Medical Records*

A "Final Report" from Texas Children's Hospital filed with the removal affidavit stated, "this fracture is plausible in this age group," and that a delay in care is "concerning for medical neglect." Medical records also demonstrated that Mother and Father brought Wystan to Texas Children's Hospital nine (9) times over the past year and half.

*Criminal Records*

In 2010, when Eshan was three years old and Reba was one year old, Mother faced charges for possession of marijuana, but the case was dismissed. In 2013, when Eshan was six years old and Reba was four years old, Mother was charged with several misdemeanors and for driving with an invalid license. She received probation.

Between October 2000 and June 2016, Father was convicted of two misdemeanors for which he served 200 days and four felonies for which he served more than eight years. In October 2012, when Eshan was five years old and Reba was three years old, Father was convicted of resisting arrest and possession of

10

marijuana, and served 30 days. In 2014, when Eshan was seven years old and Reba was five years old, Father was charged with numerous misdemeanors and convicted and incarcerated for eight months on cocaine-possession charges. In 2015, Father was charged with assault but was not incarcerated. In 2016, when Eshan was nine years old, Reba was seven years old, and Wystan was two months old, Father served ten days in jail for drug-possession.

*The Child Advocate*

At trial, the child advocate testified that the parents' positive drug tests, lack of housing stability, failure to complete counseling, and failure to seek timely medical attention for Wystan supported the recommendation for termination of parental rights. She further testified that the children's current placements were meeting the children's needs and they would be in danger if they were returned to Mother and Father.

*Final Decree of Termination*

The trial court found predicate acts for terminating Mother's parental rights to the children under section 161.001(b)(1) (D), (E), (N), and (O). The trial court found predicate acts for terminating Father's parental rights to Eshan, Wystan, and Estrid based on the same subsections. The trial court also found that termination of Mother's and Father's parental rights would be in the best interest of each child.

## II. ISSUES AND ANALYSIS

A court may terminate parental rights upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother and Father argue the record evidence is insufficient on predicate termination grounds and on the issue of best interest. Father also argues that the

Department violated his rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution.

## A. Standard of Review

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a termination-of-parental-rights case, we must consider all evidence in the light most favorable to each challenged finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). The factfinder is the sole arbiter of the credibility and demeanor of each witness. *Id*. at 346. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Yet, using this standard does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* The evidence is legally insufficient to

support the challenged finding if, after conducting this review of the record evidence, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true. *Id*. at 344–45.

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). And, in making this determination, we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)) (internal quotations omitted). Nonetheless, our review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. *In re H.R.M.*, 209 S.W.3d at 108.

## B. Termination Based on Endangerment

Mother argues the evidence is legally and factually insufficient to support termination under sections 161.001(b)(1)(D), (E), (N), and (O). Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (N), (O). Father argues the evidence is legally and factually insufficient to support termination under sections 161.001(b)(1)(D) and (E). Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E). Because Father does not challenge the trial court's predicate-act findings under section 161.001(b)(1)(N) or

and (O), even if this court were to conclude that the record contains legally or factually sufficient evidence to support termination under section 161.001(b)(1)(D) or (E), that conclusion would not provide a basis for reversing the trial court's judgment in this case. Nevertheless, the Supreme Court of Texas has held that (1) allowing (D) and (E) findings to go unreviewed on appeal when the parent has presented the issue to the appellate court violates the parent's due-process and due-course-of-law rights and (2) due process and due course of law require an appellate court to detail its analysis as to why a parent's challenge to a finding under (D) or (E) lacks merit. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019). Mother and Father have each presented the issue as to whether the evidence is legally and factually insufficient to support the (D) and (E) findings. Therefore, under binding precedent from the Supreme Court of Texas, we must address each party's challenges to the (D) and (E) findings, even though Father did not challenge the (N) finding or the (O) finding and even if this court could affirm the judgment against Mother based on the (N) finding or the (O) finding. *See id.*

As to each parent, we begin by addressing the trial court's finding under subsection (E), which provides for the termination of parental rights where the court finds "by clear and convincing evidence that a parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. §§ 161.001(b)(1)(E).

In reviewing a subsection (E) finding, we are mindful of the requirement that we detail our analysis of the sufficiency of the evidence supporting an (E) finding. *In re P.W.*, 579 S.W.3d 713, 725 (Tex. App.—Houston [14th Dist.] 2019, no pet.). By making the (E) finding as to each parent, the trial court found that Mother and Father both engaged in conduct or knowingly placed their respective children with

14

persons who engaged in conduct that endangered the children's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E). A finding of endangerment under subsection (E) requires evidence that the endangerment resulted from the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination of the parent-child relationship under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The evidence germane to this endangerment-termination case relates to a combination of medical neglect, drug abuse, and exposure to domestic violence.

*Domestic Violence.*

Evidence of domestic violence may be considered as evidence of endangerment under subsection (E). *Interest of A.R.E.*, 14-19-00437-CV, 2019 WL 5704299, at *5–7 (Tex. App.—Houston [14th Dist.] Nov. 5, 2019, no pet. h.); *In re K-A.B.M.*, 551 S.W.3d 275, 286 (Tex. App.—El Paso 2018, no pet.). A parent's abusive or violent conduct can produce a home environment that

endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *Id.; see In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (considering mother's having "exposed her children to domestic violence," as evidence of endangerment under subsection (E)); *see also Sylvia M. v. Dallas Cty. Welfare Unit*, 771 S.W.2d 198, 204 (Tex. App.—Dallas 1989, no writ) (considering "volatile and chaotic" marriage altercation during pregnancy and mother's repeated reconciliation with abusive spouse). Violent conduct by a parent toward the other parent may produce an environment that endangers the physical or emotional well-being of a child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Referral 1, based on a domestic-violence claim, remained open at the time of trial. Mouton testified that both Mother and Father acknowledged that Father assaulted Mother in 2017. Some of the medical records contain references to an altercation between Father and Mother at the hospital when Wystan was being treated. Though Mother took the children and moved out of the home and into the Star of Hope, she placed them back into danger when she chose to leave the safety of the shelter and to bring the children back under the same roof as Father. At the time of trial, Mother testified she intended to stay with Father. The trial court reasonably could have found that Mother's repeated reconciliation with Father and her decision to risk the children's safety by bringing them back to live with Father following incidents of Father's domestic violence is endangering conduct supporting the predicate ground for termination of Mother's parental rights.

*Medical Neglect*.

Although the Department initially removed the children based on a concern

16

that Wystan's injuries were indicative of child abuse, the Department's focus at trial was the delay in seeking medical treatment for the child. Neglect of a child's medical needs endangers a child. *In Interest of S.G.F.*, 14-16-00716-CV, 2017 WL 924541, at *6 (Tex. App.—Houston [14th Dist.] Mar. 7, 2017, no pet.); *Interest of J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied)(noting that failure to provide appropriate medical care for a child may constitute endangering conduct under subsection (E) even if the parent did not cause the need for medical treatment). Medical neglect can be just as dangerous to a child's well-being as direct physical abuse. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996)(finding that even in the absence of proof of direct exposure to danger a trial court's termination based on an endangerment finding is not insufficient when based on the parent's failure to obtain medical care and other neglect for their physical needs).

In her trial testimony, Mother acknowledged a three-day lapse between the time Wystan broke his leg and the time she ensured he was seen by a doctor. The indictment, along with the probable-cause affidavit and the physician's record attached to the Department's affidavit, show Wystan's physician noted that "patient's delay in care [was] concerning for medical neglect."

Father admitted being present when Wystan was injured and said he told EMS personnel Wystan's leg was not broken "because when you hit your shin, it swell up." Father testified that he heard the paramedic tell Mother that she did not need to go the hospital. Father was later charged for injury to a child by omission for the delay in treatment. The trial court reasonably could have believed the statements in the probable-cause affidavit rather than Father's and Mother's testimony about what the paramedic told them concerning the need to get medical treatment for their injured child.

17

The parties dispute facts as to whether Mother should have known the severity of Wystan's leg injury after the EMS left. Mother contends that the paramedic stated Wystan's leg was not broken. The EMS records were not offered into evidence, but the content of those records was included in the probable-cause affidavit, which was introduced into evidence and is part of the record. The affidavit contradicts Mother's contention that the paramedic told her that Wystan's leg was not broken. The affidavit indicates that Mother was concerned about the relative costs associated with transportation to or from the hospital, which suggests she was aware of the need to go to the hospital. Other records offered into evidence indicate that Mother took Wystan to an emergency room sometime before Monday but left without getting treatment because she concluded the wait was too long.

The trial court reasonably could have believed that the evidence established a three-day delay in treatment such that Mother's and Father's conduct rose to the level of medical neglect and endangering conduct. Though other medical records in the court's file show that Mother and Father regularly addressed Wystan's medical needs, under the governing standard, the trial court reasonably could have considered that by leaving Wystan's injured leg medically unattended for such a long duration — considered by one doctor to be life-threatening — Mother and Father engaged in endangering conduct.

*Drug Abuse*

Mother initially tested negative at the time of Referral 1 in June 2018, but after the children were removed, Mother tested positive on September 4, 2018, and again on January 16, 2019. Despite the positive drug-test results, Mother denied using drugs and stated that her urine was "clean." Father tested positive for cocaine while living with the children. Both parents had a criminal record for

18

drug-related offenses. Father was incarcerated several times for drug-possession offenses.

Under Texas law subsection (E) endangering conduct does not have to occur in the child's presence. *See Walker*, 312 S.W.3d at 617. Continued illegal drug use after a child's removal jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.–Houston [1st Dist.] 2006, no pet.) (en banc). Likewise, drug abuse and its effect on one's ability to parent can present an endangering course of conduct to a child in that parent's care. *In re J.O.A.*, 283 S.W.3d at 345. Drug use can endanger a child "when the environment creates a potential for danger that the parent is aware of but disregards." *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Mother's and Father's refusal to submit to drug testing may be treated by the trial court as if Mother and Father had tested positive for drugs. *See id.* (factfinder reasonably can infer that parent's failure to submit to drug tests indicates parent is avoiding testing because parent was using drugs). Even without considering their refusal to submit to drug testing, each actually tested positive for drug use. *See In re S.R.*, 452 S.W.3d at 361-62 (continued drug use after child's removal may be considered as establishing endangering course of conduct). Father admitted that he refused drug tests because he knew they would show positive results, but insisted that the results would be misleading because they would be based on previous drug use rather than current sobriety.

In addition to evidence of Mother's drug use during the course of the proceeding, the record contains Mouton's testimony that the Department's first referral to the family came when Mother tested positive for marijuana at Reba's

19

birth.

Despite the evidence of drug abuse, neither Mother nor Father would admit to a substance-abuse problem, a factor that supports the endangerment finding. When the record shows the parent's drug abuse, the parent's unwillingness to admit to having a substance-abuse problem suggests the parent will continue to engage in the same behaviors that endangered the child. *Interest of L.M.*, 572 S.W.3d 823, 835 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *See In re A.J.E.M.-B.*, Nos. 14-14-00424-CV, 14-14-00444-CV, 2014 WL 5795484, at *5 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) (considering evidence that parents "minimized concerns and were in denial of the impact that substance use has on their ability to sufficiently be in tune to the needs of their child."); *In re E.H.*, No. 02-09-00134-CV, 2010 WL 520774, at *4–*5 (Tex. App.—Fort Worth Feb. 11, 2010, no pet.) (mem. op.) (considering father's denial that his drug use and drug dealing harmed his children as factor in endangerment analysis). A parent's drug abuse exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The factfinder may give great weight to the "significant factor" of drug-related conduct. *In re L.G.R.*, 498 S.W.3d at 204.

Considering all the evidence in the light most favorable to the subsection (E) finding, assuming the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved, being mindful of any undisputed evidence contrary to the finding, and considering that evidence in our analysis, we conclude that a reasonable factfinder could form a firm belief or conviction that Mother engaged in conduct that endangered Estrid, Reba, Wystan, and Eshan's physical or

emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Applying that same standard, we likewise conclude that a reasonable factfinder could form a firm belief or conviction that Father engaged in conduct that endangered Estrid, Wystan, and Eshan's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

Considering and weighing the disputed evidence contrary to the finding against all the evidence favoring the finding, giving due deference to the trial court's findings, and after an exacting review of the entire record with a healthy regard for constitutional issues at stake, we conclude that in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder reasonably could not have formed a firm belief or conviction that Mother and Father engaged in conduct described in subsection (E). *See In re A.B.*, 437 S.W.3d at 503; *In re J.O.A.*, 283 S.W.3d at 345. Thus, the trial evidence stands factually sufficient to support the trial court's subsection (E) finding.

Because we conclude the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(b)(1)(E) as to both Mother and Father, we do not address Mother's argument that the evidence is legally and factually insufficient to support the trial court's findings under sections 161.001(b)(1)(D), (N), and (O). Nor do we address Father's argument that the evidence is legally and factually insufficient to support the trial court's findings under section 161.001(b)(1)(D). Thus, we overrule Mother's second issue, which renders her first, third, and fourth issues moot, and we overrule Father's third issue, which renders his first issue moot.

### C. Best Interest of the Children

Texas courts presume that keeping a child with the child's natural parent

21

serves the child's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the best-interest issue. *See In re S.R.*, 452 S.W.3d at 366. The considerations the trier of fact may use to determine the best interest of the child, known as the *Holley* factors, include:

(1) the child's desires;

(2) the child's present and future physical and emotional needs;

(3) the present and future emotional and physical danger to the child;

(4) the parental abilities of the person(s) seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

*Desires of the children*

All four children currently reside in foster placements. Eshan and Reba both expressed desires not to be returned to their parents but to remain in foster care. Wystan and Estrid were under the age of three at the time of trial and so were too

young to express any views on this subject.[2] None of the children testified. When children are too young to express their desires, the factfinder may consider their circumstances, for example that a child has bonded with the foster family, is well cared for in the current placement, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Mother and Father testified that the children told them that Eshan wanted to be with them. Several witnesses testified that Eshan and Reba sought out their parents through social media. Mother testified that her relationship with her children remains strong, and that she feels bonded with her children. But, according to the Department, the two older children, Eshan and Reba, reportedly do not want to return to living with Mother and Father and had not spoken about returning to them in months. Callicut testified that none of the children had asked about their parents for several months, and that Mother had not seen or visited the children for more than six months and all the children were "doing exceptionally well" in their current foster homes. The Department contends that the children's failure to ask about their parents suggests that any desire to move in with Mother and Father has diminished. Father asserts that the ad litem failed to represent Eshan and Reba. Though we do not arrive at the same inference with respect to Eshan and Reba, we conclude that the evidence concerning the desires of these two children is neutral. Because testimony tends to show the two younger children are thriving in their foster home, the trial court reasonably could have weighed this evidence in favor of finding that termination of Mother's and Father's parental rights would be in Wystan's and Estrid's best interests.

*Present and future emotional and physical needs of the children*

At the time of trial, Mother had not seen or visited her children for more

---

[2] At the time of trial, Eshan was twelve, Reba was ten, Wystan was three, and Estrid was two.

23

than six months. Mother claims the record contains no evidence that the "minor" children "had any special physical/emotional needs before or after being placed in [the Department's] custody, or that the children would have any such needs in the future." According to Callicut, when Wystan first came into care, he was not talking and was diagnosed with "unspecified speech disorder." Mother believed Wystan was autistic. The Department took Wystan to a speech therapist and a psychologist, both of whom concluded Wystan is not autistic. After sessions with an Early Childhood Intervention worker and therapist, Wystan began to talk "and now talks quite well," according to Callicut.

Callicut further testified all of the children were "doing exceptionally well" in their current foster homes and each of their needs, especially Wystan's special needs are being met in their respective foster homes. Callicut testified that Wystan and Estrid live on a farm, where both children "actually have a sense of normalcy." Both children go to day care where they receive "the proper education that they need." Wystan's foster parents also have a specialist who works with Wystan to develop his speech.

The Department set forth general evidence concerning Reba's and Eshan's emotional needs. Both Reba and Eshan had changed foster homes at least once during the pendency of the case. Callicut testified Reba was "doing well" in her placement and Eshan was "looking forward to doing some extracurricular activities" in his placement.

In sum, the foster parents for all four children were taking care of their physical and emotional needs. The record evidence shows that neither Father nor Mother were meeting the children's present needs and based on past performance, they were unlikely to be able to meet the children's future emotional and physical needs. Because the need for stability is of paramount importance to a child's

24

emotional and physical well-being, and in light of the record showing that Mother did not provide a stable home for her children, had no job that would enable her to support them financially, had not seen or visited her children for more than six months, elected to continue her relationship with Father despite his history of family violence, and continued to test positive for illegal drugs, a reasonable trier of fact could have found this factor to weigh heavily in favor of a finding that termination of Mother's parental rights was in the children's best interest. *See Quiroz v. Department of Family and Protective Services*, No. 01–08–00548– CV, 2009 WL 961935, at *10 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.).

Father did not provide a stable home for his children, he had no job that would enable him to support them financially, and he had not seen or visited with his children for more than six months before trial. Father tested positive for illegal drugs and then refused to submit to any additional court-ordered drug tests. In light of this record and because the need for stability is of paramount importance to a child's emotional and physical well-being, a reasonable trier of fact would have found this factor to weigh heavily in favor of a finding that termination of Father's parental rights is in the children's best interest. *See Quiroz* 2009 WL 961935, at *10.

Mother maintains her relationship with Father, a convicted felon who has been incarcerated for more than nine years out of the twenty years they have been together. At least one of Father's convictions was for family violence. Mother tested positive for illegal drugs twice during the pendency of this case, persistently denied using drugs, and ultimately refused to provide hair or urine samples when asked to comply with her required, court-ordered random drug tests. Father tested positive for illegal drugs once before his children were removed and again during

25

the pendency of this case, and he refused to submit to any court-ordered random drug tests after September 2018. This evidence shows Mother and Father lack the will and abilities to serve as a viable resource for the children's basic needs or stability. *See In re C.A.J.,* 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) ("Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs.").

*Parental abilities of those seeking custody, the stability of the home or proposed placement and plans by the agency seeking custody*

Texas courts recognize as a paramount consideration in the best-interest determination a child's need for a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). So, factfinders may look to evidence about the present and future placement of the child as relevant to the best-interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Both Mother and Father stated that they wanted the trial court to allow them to continue to get more services and complete their respective plans, but neither explained how they might succeed if given the opportunity. Nor did either offer explanations for their failure to complete the plans the trial court ordered.

According to Callicut, the Department contacted relatives and fictive kin during the pendency of the case as potential placements for all four children. Only one of three relatives contacted responded to the Department's inquiries. That relative said she was not financially able to support the children as she had two of her own and also was taking care of her mother. The Department also conducted two fictive-kin home studies. The Department denied one due to a concern about criminality and another because there was simply not sufficient room for the current residents and all four children. The Department ruled out the other possible fictive-kin referral because there was a pending child-sexual-assault

charge on the male in the household.

Eshan, Reba, Wystan, and Estrid have been in the Department's temporary managing conservatorship since August 21, 2018. Callicut testified that all four children are "doing exceptionally well," and all of their needs are being met in their current foster homes. The Department's long-range goal for Eshan is conservatorship; for Reba, Wystan, and Estrid, it is unrelated adoption.

According to the Department, Eshan says he does not want to be returned to his parents nor does he want to be "broadcasted" as an adoptee. He is happy with and wants to stay in his current foster home "[b]ecause he wants to stay closer to his brother and sisters." Eshan's foster parents "are willing to do conservatorship up until [Eshan turns] 18."

Reba also expressed a desire not to be returned to her parents. Her foster mother just adopted two other children, but was able to recommend a family who says they would be willing to adopt Reba. At the time of trial, the Department had just begun getting the information about this family, but Reba's current foster mother is "willing to keep [Reba] as long as need be."

Given all of these facts, the fourth, sixth and seventh *Holley* factors supported the trial court's best-interest finding.

*The emotional and physical danger to the children, now and in the future, acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parents acts or omissions*

The evidence that supported the trial court's findings under subsection (E), discussed above, also supports the court's finding that Mother's pattern of inappropriate behaviors during her children's lives has and will continue to jeopardize their well-being. *In re M.G.D.*, 108 S.W.3d 508, 511 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

27

Father's pattern of criminal conduct and inappropriate behaviors during his children's lives, and Mother's continuing relationship with Father and her own criminal activity, shows that each independently pose significant emotional and physical danger to their respective children now and in the future. In assessing each child's best interest, the trial court reasonably could have weighed this evidence in favor of terminating Mother's and Father's parental rights.

*Conclusion of Holley Analysis*

Evidence introduced at trial supports a finding that termination of Mother's and Father's parental rights favored the children's best interest. Nothing in the record would prevent the trial court from reasonably forming a firm belief or conviction that termination of Mother's and Father's parental rights was in their respective children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. While the *Holley* factors are not exclusive, and need not all be satisfied to support a best-interest finding, in this case, virtually all of the individual factors weigh in favor of the trial court's determination. The evidence is legally and factually sufficient to support the trial court's findings that the termination of Mother's parental rights is in the best interest of each of her children, and the finding that the termination of Father's parental rights is in the best interest of each of his children.

We overrule Mother's fifth issue and Father's fourth issue.

## D. Father's Due-Process Challenge

In his first issue, Father argues that the Department violated his due process rights and equal protection under the Fourteenth Amendment of the United States Constitution, premised on his contention that the Department knew he could not read. The Department responds that Father did not preserve this issue for appellate review.

28

Due process and equal-protection violations must be raised in the trial court for them to be preserved on appeal. *See In re L.M.I.*, 119 S.W.3d at 710–11; *see also In re B.L.D.*, 113 S.W.3d 340, 349–55 (Tex. 2003) (discussing preservation of error in termination cases); *In Interest of F.E.N.*, 542 S.W.3d 752, 768 (Tex. App.—Houston [14th Dist.] 2018)(finding complaint not preserved concerning improper translation at trial), *review denied sub nom. Interest of F.E.N.*, 579 S.W.3d 74 (Tex. 2019). Upon review of the record, we conclude that Father failed to preserve this issue for appellate review.   Father appeared at trial and did not raise the issue at any point during trial.  And nothing filed on his behalf before trial raises this complaint or contains citations to any constitutional authority. Nor did Father raise the issue in any post-judgment motion.  Having failed to preserve error, Father waived the complaint. We overrule Father's first issue.

## III. CONCLUSION

The evidence is legally and factually sufficient to support the predicate termination finding under subsection (E) as to both Mother and Father. And, the evidence is legally and factually sufficient to support the trial court's findings that (1) the termination of Mother's parental rights is in the best interest of each of her children and (2) the termination of Father's parental rights is in the best interest of each of his children.  Father failed to preserve error on his due-process and equal-protection complaint and so forfeited appellate review of that point.   Having overruled all of the issues presented, we affirm the judgment of the trial court.


/s/     Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Christopher and Bourliot. (Justice Bourliot concurs without opinion.)